In the
# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No. 23-2553

UNITED STATES OF AMERICA,

**Plaintiff-Appellee,**

v.

JOHN P. SEIWERT,

**Defendant-Appellant.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 20 CR 443 — Robert W. Gettleman, *Judge*.

## BRIEF OF THE UNITED STATES

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

MORRIS PASQUAL
Acting United States Attorney
for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

RAMON VILLALPANDO
Assistant United States Attorney

BRIAN J. KERWIN
Assistant United States Attorney
Deputy Chief of Appeals, Criminal Division

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

JURISDICTIONAL STATEMENT ................................................................... 1

ISSUES PRESENTED FOR REVIEW ............................................................... 1

STATEMENT OF THE CASE ............................................................................ 1

SUMMARY OF ARGUMENT .......................................................................... 13

ARGUMENT ................................................................................................... 15

I.    Section 922(g)(3) Is Constitutional Under the Second
      Amendment. ......................................................................................... 15

      A.    Standard of Review.................................................................... 15

      B.    Statutory Background ................................................................ 15

      C.    Analysis ...................................................................................... 17

            1.    Under Supreme Court and Seventh Circuit Precedent,
                  Section 922(g)(3) Remains Constitutional. .............................. 17

            2.    Section 922(g)(3) Is Part of This Nation's Historical
                  Tradition of Firearms Regulation and Thus Constitutional
                  Under the Second Amendment. ............................................... 25

            3.    Section 922(g)(3) Is Sufficiently Similar to Historical
                  Traditions of Disarming Those Who Presented a Risk of
                  Danger, the Intoxicated, and the Mentally Ill.......................... 37

II.   Section 922(g)(3) Is Not Unconstitutionally Vague. ......................... 44

      A.    Standard of Review.................................................................... 44

      B.    Analysis ...................................................................................... 44

III.  The Government Presented Sufficient Evidence for a Rational Jury to Find Defendant Guilty of Being an Unlawful User of, or Addicted to, a Controlled Substance In Possession of a Firearm. ................................................................................................ 47

   A.   Standard of Review ........................................................ 47

   B.   Analysis .......................................................................... 48

CONCLUSION ............................................................................. 52

# TABLE OF AUTHORITIES

## CASES

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) ............................ 28, 29, 31

*Barrett v. United States*, 423 U.S. 212 (1976) .................................................. 16

*District of Columbia v. Heller*, 554 U.S. 570 (2008)................................*passim*

*Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015) .......... 41

*Harmelin v. Michigan*, 501 U.S. 957 (1991) ..................................................... 37

*Huddleston v. United States*, 415 U.S. 814 (1974) .......................................... 41

*Johnson v. United States*, 576 U.S. 591 (2015) ................................................ 46

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ............................................ 28, 38

*Lewis v. United States*, 445 U.S. 55 (1980)....................................................... 40

*Mai v. United States*, 952 F.3d 1106 (9th Cir. 2020) ....................................... 34

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...................................*passim*

*Musacchio v. United States*, 577 U.S. 237 (2016)............................................. 48

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)............*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525
   (2020) ............................................................................................................ 18

*Range v. Attorney Gen. of the U.S.*, 69 F.4th 96 (3d Cir. 2023) ..... 27, 28, 29, 30

*Scarborough v. United States*, 431 U.S. 563 (1977) ........................................ 16

*Smith v. Goguen*, 415 U.S. 566 (1974) .............................................................. 46

*State v. Shelby*, 2 S.W. 468 (Mo. 1886) ............................................................ 34

*United States v. Agee*, No. 21-CR-350, 2023 WL 6443924 (N.D. Ill. Oct. 3,
   2023)............................................................................................................... 30

iii

*United States v. Cook*, 970 F.3d 866 (7th Cir. 2020)................................*passim*

*United States v. Coombes*, 629 F. Supp. 3d 1149 (N.D. Okla. 2022).............. 26

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023)............................ 42, 43

*United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011)............................ 20, 38

*United States v. Gates*, No. 22-CR-397, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023)....................................................................................................... 41

*United States v. Gay*, 98 F.4th 843 (7th Cir. 2024)...................... 23, 24, 39, 43

*United States v. Holden*, 70 F.4th 1015 (7th Cir. 2023) ................................ 15

*United States v. Jackson*, 5 F.4th 676 (7th Cir. 2021) ................................... 47

*United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) ............... 27, 28, 29, 31

*United States v. Lanier*, 520 U.S. 259 (1997) ................................................ 45

*United States v. Maez*, 960 F.3d 949 (7th Cir. 2020) ..................................... 51

*United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024) ........................ 39

*United States v. Protho*, 41 F.4th 812 (7th Cir. 2022) ............................ 15, 44

*United States v. Salerno*, 481 U.S. 739 (1987) ............................................. 15

*United States v. Seay*, 620 F.3d 919 (8th Cir. 2010) ...................................... 20

*United States v. Stevens*, 559 U.S. 460 (2010)............................................... 15

*United States v. Tooley*, 717 F. Supp. 2d 580 (S.D. W. Va. 2010) .................. 26

*United States v. Veasley*, 98 F.4th 906 (8th Cir. 2024) ....................... 36, 43, 44

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) ..........................*passim*

## STATUTES

18 U.S.C. § 922(g)(1) ............................................................................. 23, 41, 43

18 U.S.C. § 922(g)(3) ..................................................................................*passim*

Pub. L. No. 90-351 ................................................................. 15

Pub. L. No. 90-618 ................................................................. 15

Pub. L. No. 99-308 ............................................................ 15. 16

**RULE**

Federal Rules of Criminal Procedure 29 ................................. 13, 47

**OTHER AUTHORITIES**

1 Samuel Shepherd, *Statutes at Large of Virginia from October Session 1792, to December Session 1806, Inclusive* (1835) (1792 law) ................... 35

1 The Public Acts of the General Assembly of North Carolina (1804) (1777 N.C. law) ................................................................. 31

1 *The Public Statute Laws of the State of Connecticut* (1808) (1793 law). ..... 36

1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* (1688) .................... 27

1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* (1688) ...................... 28

1 William Blackstone, *Commentaries on the Laws of England* (1765) ........... 35

1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* (1823) ................................................................. 32

1692-1694 Mass. Acts 11-12 .............................................................. 25

1696-1701 N.H. Laws 15 .................................................................... 25

1769 Va. Act 13 .................................................................................. 35

1798 Mass. Act 813 ........................................................................... 36

1837 Mass. Acts 273 ......................................................................... 33

1837 Me. Laws 424 ........................................................................... 33

1844 R.I. Pub. Laws 503 ................................................................... 33

1867 Kan. Sess. Laws 25 ................................................................... 34

1878 Miss. Laws 175-76 ................................................................ 34

1881 Fla. Laws 87 ......................................................................... 36

1883 Kan. Sess. Laws 159 ............................................................ 36

1883 Wis. Sess. Laws 290 ............................................................ 34

1899 N.C. Pub. Laws 202-1 .......................................................... 36

1909 Idaho Sess. Laws 6.............................................................. 34

1927 N.J. Laws 745...................................................................... 36

1931 Pa. Laws 499 ....................................................................... 36

1935 Ind. Act 161 ......................................................................... 36

1935 S.D. Sess. Laws 356 ............................................................ 36

1935 Wash. Sess. Laws 601 ......................................................... 36

1936 Ala. Acts 52 ......................................................................... 36

2 Arthur Vollmer, *U.S. Selective Serv. Sys., Military Obligation: The American Tradition*, pt. 8, New Jersey (1947) ............................. 33

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ....... 26

2 William Littell, *The Statute Law of Kentucky* (1810) ................... 35

4 *Journals of the Continental Congress 1774-1789* (1906) (resolution of March 14, 1776) ............................................................................ 31

47 Stat. 650, 652 (1932) ............................................................... 36

5 Colonial Laws of New York (1894)............................................... 32

5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay (1886) ("1776 Mass. Law")............................ 31

7 Records of the Colony of Rhode Island and Providence Plantations in New England (1862) ("1776 R.I. Law") ............................................. 31

9 The Statutes at Large of Pennsylvania from 1682 to 1801 (1903) ("1777 Pa. Law") ....................................................................................................... 31

9 The Statutes at Large; Being A Collection of All the Laws of Virginia (1821) ("1777 Va. Law") ............................................................................. 31

Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations (Hall, 1767) ................................................................................... 33

Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776 (1777) ...................................... 31

Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* (1949) ........................................... 35

Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226 (1978) ............................................ 29

Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* (1812) ................................................... 32

Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866) .......................................... 27

David F. Musto, *The American Experience with Stimulants and Opiates, PERSP. ON CRIME & JUST* (1997-98) ................................................ 40

Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635 (1937) ............................................................................................ 29

Edward Coke, *The First Part of the Institutes of the Lawes of England, or, a Commentarie upon Littleton* § 405 (1628) ................................... 35

Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America, 1776–1914* (2023) ............................................................................................ 40

Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* (1994) .............................................................................. 36

H.R. Doc No 407 (1966) ....................................................................................... 16

H.R. Rep. No 1486 (1966) .................................................................................... 16

Henry Care, *English Liberties, or the Free-Born Subject's Inheritance* (6th ed. 1774) ................................................................. 35

James Dunlop, *The General Laws of Pennsylvania* (2d ed. 1849) (1822 law) 33

James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381 (1988) ............................................. 29

Joseph Blocher & Catie Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, in *NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY* (Blocher, J. et al. eds.) ....................... 30

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020) ............... 29

Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* (1987) ......................................................................... 33, 34

Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662) ....................... 25

Mo. Rev. Stat. § 1274 (1879)............................................... 34

N.C. Declaration of Rights of 1776 § XVII, in *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* (Neil Cogan ed., 2d ed., 2014) ....... 31

Pa. Declaration of Rights of 1776 § XIII, in The Complete Bill of Rights, supra, at 278............................................................. 32

Randolph Roth*, "Why Guns Are and Are Not the Problem,"* in Jennifer Tucker, et al., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (2019) ............. 33

Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield* (1800), 19 Law & Soc'y Rev. 487 (1985)......... 35

S. Rep. No. 1667 (1966) .................................................... 16

Sam Kimble, *Revised Ordinances of the City of Manhattan and Rules of the Council* (1887) ............................................................ 36

Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006).................................... 29

Sir John Knight's Case, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686)............ 25

Statute of Northampton, 2 Edw. 3, c.3 (1328)................................................ 25

The Charters & General Laws of the Colony and Province of Massachusetts Bay (1814)................................................................................................. 32

*The Public Records of the Colony of Connecticut From May, 1775 to June, 1776* (1890) (1775 Conn. Law).................................................................... 31

U.S. Treasury Dep't, STATE LAWS RELATING TO THE CONTROL OF NARCOTIC DRUGS AND THE TREATMENT OF DRUG ADDICTION (19631) 1-9 ...................................................................................................... 40

Vagrancy Act of 1744, 17 Geo. 2, c. 5 ............................................................ 34

William Rawle, *A View of the Constitution of the United States of America* (2d ed. 1829) ................................................................................................. 26

# JURISDICTIONAL STATEMENT

Defendant-Appellant's jurisdictional statement is complete and correct.

# ISSUES PRESENTED FOR REVIEW

1.      Whether 18 U.S.C. § 922(g)(3), which prohibits a person who is an unlawful user of or addicted to any controlled substance from possessing a firearm, violates the Second Amendment.

2.      Whether the phrase "unlawful user of a controlled substance" renders § 922(g)(3) unconstitutionally vague.

3.      Whether the government presented sufficient evidence at trial for a rational jury to conclude that defendant was an unlawful user of or addicted to a controlled substance while in possession of a firearm.

# STATEMENT OF THE CASE

## *Offense Conduct*

In June 2020, defendant was addicted to drugs. Tr. 193; Ex. 20 at 4-5.[1] For 20 years, he had used heroin and crack cocaine on a daily basis. *Id.* Defendant lived with his father, who collected guns, in Orland Park, Illinois (the "Orland Park Residence") until his father's death in June 2020. Tr. 307-18, 323.

---

[1] Citations to the Original Electronic Record on Appeal are designated as "R." followed by the document number. Defendant's brief is cited as "Br." Citations to the trial transcript are cited as "Tr." and are available at R. 110-12. Citations to the government's exhibits admitted at trial are cited as "Ex.," followed by the exhibit number, and are available at R. 134. Page numbers are included where appropriate.

On June 29, 2020, two days after his father died, defendant met with his drug dealer, Dennis German, at the Orland Park Residence. Tr. 21, 33, 181-82; Ex. 20 at 6-7, 9-12, 22-32. During the meeting, defendant gave German a Beretta Model 950 BS .25 ACP caliber pistol bearing serial number BU04651V (the "Beretta") in exchange for narcotics that defendant expected German to give him at a later time. *Id.* That evening, law enforcement officers observed German shooting a pistol outside of his home in Robbins, Illinois (the "Robbins Residence"). Tr. 21. They quickly obtained and executed a warrant to search the Robbins Residence and recovered, inside a mattress, the Beretta defendant had given German alongside bags of apparent narcotics.[2] Tr. 20-21, 25-32. Officers also executed a warrant to search German's cell phone, on which they discovered evidence that—after defendant gave German the Beretta— defendant offered German a revolver (the "Ruger") and sent German a photograph of that firearm. Tr. 33-34, 45-49; Ex. 12.

On July 30, 2020, law enforcement searched the Orland Park Residence and recovered the Ruger—a Ruger Red Hawk .357 Magnum caliber revolver,

---

[2] German was charged in a separate case with multiple narcotics and firearms-related violations. *United States v. German*, 20 CR 330 (N.D. Ill.). Count Eight of the 12-count superseding indictment in that case also charged defendant with conspiring with German to distribute cocaine and cocaine base. *Id.* at R. 112. German pled guilty to four counts, including to charges of distributing heroin and operating a narcotics stash house, and was sentenced to 156 months' imprisonment. *Id.* at R. 233, 296. On the government's motion, the district court later dismissed the sole count as to defendant in that case without prejudice. *Id.* at R. 201.

bearing serial number 501-133-56—and drug paraphernalia, among other contraband. Tr. 49-50, 205-06, 213-21, 236-39. In an interview that followed the search, defendant admitted he gave German the Beretta and offered him the Ruger. Tr. 66-77; Ex. 20 at 6-14, 22-24, 28-33. Defendant further confessed that for 20 years he had been a daily user of heroin and crack cocaine, and that he had used crack cocaine just a couple of hours earlier that same day. Ex. 20 at 4-5. Defendant, who described himself as a "functioning drug addict," further explained that—when the agents arrived to execute the warrant that day—he was awaiting the arrival of his drug dealer, from whom he planned to buy an additional $60 worth of crack cocaine. Tr. 53-61, 193; Ex. 18 at 1-2; Ex. 20 at 14.

### *Indictment*

On October 13, 2022, a grand jury returned a second superseding indictment that charged defendant with two counts of possessing a firearm while knowing that he was an unlawful user of or addicted to a controlled substance, in violation of 18 U.S.C. § 922(g)(3). R. 92. Count One alleged that defendant possessed the Beretta from on or about June 27, 2020, until June 29, 2020. *Id.* Count Two alleged that defendant possessed the Ruger from on or about June 27, 2020, until July 30, 2020. *Id.*

***Motion To Dismiss***

On March 15, 2022, defendant filed a motion to dismiss the indictment in which he argued that § 922(g)(3) was unconstitutionally vague, both on its face and as applied to him, because (he contended) the statute "lacks certainty as to when a person who uses controlled substances periodically is prohibited from possessing a firearm, and at what point a person ceases to be an unlawful user of controlled substances." R. 80 at 2. Defendant conceded, though, that Seventh Circuit precedent—namely, *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), and *United States v. Cook*, 970 F.3d 866 (7th Cir. 2020)—foreclosed his challenges. R. 80 at 1, nn.1 & 2. Defendant explained that he raised the arguments to preserve them for appeal (*id.*), and the district court took them under advisement (R. 81).

On August 24, 2022, defendant filed a renewed motion to dismiss the indictment, arguing that the Second Amendment principles articulated in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), precluded the government from restricting his right to possess a firearm. R. 85. Defendant's motion acknowledged that the Supreme Court had limited the right to bear arms to "law-abiding citizens," *id.* at 11, but nevertheless contended that he

belonged in that group because, in his view, Illinois law did not preclude him from obtaining a Firearm Owners Identification ("FOID") card.[3] *Id.* at 4.

In its response, the government stressed that the Supreme Court—in both *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008)—repeatedly characterized the right protected by the Second Amendment as belonging to "law-abiding, responsible citizens," a class to which habitual drug users like defendant do not belong. R. 88 at 4-5. The government refuted the notion that defendant could obtain a FOID card, highlighting that Illinois law unequivocally precludes drug addicts from doing so. *Id.* at 7-8. The government further emphasized that *Bruen* made clear that the government may regulate firearms possession so long as the regulation is consistent with the nation's historical traditions, which "historical analogies"—like bans on firearm possession by felons, the mentally ill, and other dangerous or untrustworthy persons—demonstrate with respect to unlawful drug users. *Id.* at 9-14.

The district court agreed with the government and denied defendant's motion on two grounds. First, the district court held that unlawful users of controlled substances fall outside of the Second Amendment's protections, as such individuals are "not, by definition, law-abiding citizens and, instead, are among the classes of individuals whose rights to bear arms historically have

---

[3] Defendant did not actually have a FOID card. R. 7 at 2.

been restricted for public safety." R. 89 at 4. Second, the court ruled that § 922(g)(3) complied with the Second Amendment because it is "relevantly similar to [historical] regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness." *Id.*

*Trial*

Defendant proceeded to a jury trial, which began on October 31, 2022. R. 104. The government presented four witnesses in its case-in-chief.

U.S. Postal Inspector David LaMonte, formerly of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), testified that in 2020, ATF agents investigated a drug trafficking operation based in Robbins, Illinois, and that German was the primary target. Tr. 8-9. Inspector LaMonte described regularly surveilling the Robbins Residence from February 2020 through June 30, 2020, during which time law enforcement officers observed defendant visiting it "very frequently, sometimes daily, sometimes multiple times per day." Tr. 79.

Inspector LaMonte further testified that on June 29, 2020, law enforcement observed German shoot a firearm outside of the Robbins Residence before entering his home with the weapon, prompting ATF agents to obtain a search warrant. Tr. 21-25. During the search, conducted the next day, law enforcement recovered the Beretta. Tr. 20-21, 28-32. And during a

subsequent search of German's cell phone, ATF found evidence that German and defendant had exchanged narcotics and firearms. Tr. 33-34, 41-49. For example, law enforcement found a text message defendant sent to German on June 30, 2020—the day after defendant gave him the Beretta—in which defendant offered German a larger firearm, namely, the Ruger:



Tr. 48-49; Ex. 12. The government also admitted an enlarged image of the photo within the message, which more clearly depicted the Ruger, resting on defendant's leg, and—as identified by an expert witness—a pipe of the kind commonly used for smoking crack cocaine, seen with a red box drawn around it in the top left-hand corner:



Tr. 48-49, 286-87.

      Inspector LaMonte explained that, after discovering the phone evidence, ATF agents obtained a warrant to search defendant's Orland Park Residence, which they executed on July 30, 2020. Tr. 49-50. ATF Special Agent Brent Bollenberg, who was part of the search team, testified that he found the Ruger in a wastebasket—which also contained several other firearms—located

approximately six feet from where defendant was standing when law enforcement entered the home. Tr. 213-21.

Inspector LaMonte testified that, during the search, defendant and a friend (who was with him at the time of the search) agreed to be interviewed at a local police station. Tr. 53-56. Inspector LaMonte patted down defendant before allowing him to enter his police vehicle and found that defendant possessed $600 in cash. Tr. 58-59. Defendant told Inspector LaMonte that he intended to use $60 of it to purchase narcotics from a drug dealer who was presently on his way to the Orland Park Residence. Tr. 58-61.

The jury also heard and viewed audio- and video-recordings from inside the police vehicle, which captured various comments by defendant about his drug addiction. For instance, defendant told his friend that he could not remember where he "put the dope [in his house] at"; that he was hopeful that law enforcement will "pass it by" during the search; that he put his "damn pipe in the fucking stove"; and that he "took the crack out of [his] pants" and "hid it under the couch" before they left. Tr. 60-65; Ex. 18 at 2-4. In addition, during the ride to the station, defendant told Inspector LaMonte that he was "a user not a drug dealer," Ex. 18 at 10, and requested that if law enforcement found anything in his home "drug wise," that they "leave it there," Ex. 18 at 6. *See also* Tr. 60-65.

At the police station, Inspector LaMonte and another investigator conducted a more formal interview of defendant, preceded by *Miranda* warnings, which also was recorded by audio and video. Tr. 65-68, 76-78. During the interview, the recording of which the jury viewed, defendant made numerous admissions about his drug use and gun possession, including that:

- He had used both crack cocaine and heroin every day for the past 20 years. Ex. 20 at 4-5.

- He last used crack cocaine a "couple hours" before the interview. *Id.*

- German was defendant's drug dealer, from whom he had purchased drugs approximately 300 times in the prior eight months (that is, since approximately November 2019). Ex. 20 at 7-9.

- He gave German, who he knew to be a felon, the Beretta on June 29, 2020, and expected that German would give him a "couple grams" in return, but German got "busted" before doing so. Ex. 20 at 9-12, 22-24, 31.

- He was a "functioning drug addict." Ex. 20 at 14. *See also* Ex. 20 at 27 ("I'm a drug addict, man.").

- He used coded language when texting with German about drugs. Tr. 86-95; Ex. 20 at 16-22. For instance, defendant explained that in a June 14, 2020 message law enforcement found on German's phone—in which defendant requested "a pizza half cheese, and half black olives"—defendant was seeking a half gram of crack cocaine and a half gram of heroin. Ex. 20 at 17-18.

- He sent German the June 30, 2020 text message depicted in Exhibit 12 (viewable above), offering German the Ruger in the photo. He did so because, when defendant gave German the Beretta, German "was just talking about [wanting] something bigger." Ex. 20 at 31-33. In the photo, the Ruger rested on defendant's leg. Tr. 83-85; Ex. 20 at 14, 28-29.

*See also* Tr. 67-68, 75-98.

ATF Special Agent Angelo Salcepuedes, another member of the search team, testified that law enforcement recovered more than 100 firearms from the Orland Park Residence. Tr. 252-53. Additionally, they found digital scales on defendant's kitchen table and a glass pipe near his kitchen stove. Tr. 230-40. Special Agent Michael Culloton, a narcotics expert from the Federal Bureau of Investigation, viewed photographs of certain items of evidence—including the photo of the Ruger on defendant's leg—and explained that the digital scales recovered in the search commonly are used to measure narcotics, and that the glass pipe found in defendant's home is the type traditionally used for smoking crack cocaine. Tr. 236-38, 265-84, 286-88.

Lastly, the jury viewed home security footage taken from inside the Robbins Residence on March 19, 2020, which captured defendant and German in the kitchen. Tr. 15-20. The video depicted defendant pouring something into a glass pipe after it was taken off a digital scale, *id.*; according to Agent Culloton, the individuals in the video appear to be using the scale to measure narcotics, Tr. 289-90.

After the government rested, defendant moved for a judgment of acquittal, arguing that the government failed to prove that he possessed the requisite *mens rea* to commit the charged offenses. Tr. 297-99. The district court denied the Rule 29 motion, quoting defendant's admissions in his July

30, 2020 interview and concluding, "if that's not enough for a jury to conclude that he had the requisite state of mind, I don't know what is." Tr. 300.

In the defense case, defendant's sister, Laurie Seiwert, testified regarding, among other things, her father's gun collection; his June 27, 2020 death; and her observation that his death appeared to trigger an increase in defendant's drug use in the "one month after [their] father died." Tr. 308-09, 323, 348.

Relevant here, the district court instructed the jury that to find defendant guilty of violating § 922(g)(3), it must conclude beyond a reasonable doubt that (1) defendant knowingly possessed a firearm; (2) at the time of the possession, defendant was an unlawful user of, or addicted to, a controlled substance; (3) at the time of the possession, defendant knew he was an unlawful user of, or addicted to, a controlled substance; and (4) the firearm had been shipped or transported in interstate commerce before defendant possessed it. R. 106 at 20. The district court defined the term "unlawful user of a controlled substance" as follows:

> The term "unlawful user of a controlled substance" contemplates the regular and repeated use of a controlled substance in a manner other than as prescribed by a licensed physician. The one time or infrequent use of a controlled substance is not sufficient to establish the defendant as an "unlawful user." Rather, the defendant must have been engaged in use that was sufficiently consistent and prolonged as to constitute a pattern of regular and repeated use of a controlled substance. The government need not show that defendant used a controlled substance at the precise time he possessed a firearm. It must, however, establish

that he was engaged in a pattern of regular and repeated use of a controlled substance during a period that reasonably covers the time a firearm was possessed.

*Id.* at 24.

The jury found defendant guilty of both § 922(g)(3) counts charged in the indictment. R. 108.

### Post-Trial Motion

Defendant filed a post-trial motion for judgment of acquittal and for a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33. In his motion, defendant renewed the argument that § 922(g)(3) is unconstitutionally vague as applied to him, because, he contended, the statute lacks an "ascertainable standard" setting out "boundaries" between lawful and unlawful conduct. R. 115 at 3. Defendant also reiterated his earlier challenge to the sufficiency of the evidence. *Id.* at 5. The district court denied the motion. R. 117.

### Sentencing

On July 20, 2023, the district court sentenced defendant to concurrent terms of imprisonment of 12 months and one day and to concurrent three-year terms of supervised release. R. 124, 125.

### SUMMARY OF ARGUMENT

As this Court already has held in *Yancey*, 621 F.3d at 687, and *Cook*, 970 F.3d at 878, 18 U.S.C. § 922(g)(3)'s prohibition on firearm possession by

habitual controlled substance users does not offend the Second Amendment. The Supreme Court's decision in *Bruen*, 597 U.S. 1, does not change that conclusion. Both before and after *Yancey* and *Cook*, the Supreme Court has characterized the right to keep and bear arms as belonging to "law-abiding, responsible citizens." Habitual users of heroin and crack cocaine, like defendant, do not fall into this category. Indeed, as this Court recognized in *Yancey*, dating back to this country's founding, our nation's history is replete with laws categorically disarming those deemed to be not law-abiding and responsible: groups who posed a risk of danger, intoxicated individuals, and the mentally ill. Section 922(g)(3) is analogous to each of these bans.

In *Cook*, this Court also rejected defendant's argument that § 922(g)(3)'s use of the phrase "unlawful user of any controlled substance" renders the statute unconstitutionally vague. This Court and others have defined the term to mean those who use illicit narcotics regularly and repeatedly. And there is nothing problematic with courts defining the term, as the Supreme Court has said.

Finally, the evidence at trial was more than sufficient for a rational jury to conclude that defendant—a self-proclaimed drug addict, who used heroin and crack cocaine daily—was an unlawful user of controlled substances, and that he knew it, in the time periods in which he was charged with possessing two firearms.

# ARGUMENT

## I. Section 922(g)(3) Is Constitutional Under the Second Amendment.

### A. Standard of Review

This Court reviews a challenge to a criminal statute's constitutionality *de novo*. *United States v. Protho*, 41 F.4th 812, 827 (7th Cir. 2022).

Unless a criminal law is invalid in every possible application or there are First Amendment or vagueness concerns, a court should not strike the statute on its face and should instead assess its constitutionality only as applied to the defendant before it. *United States v. Stevens*, 559 U.S. 460, 472-73 (2010); *United States v. Holden*, 70 F.4th 1015, 1017 (7th Cir. 2023); *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020). Facial challenges can succeed only if defendant can "establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

### B. Statutory Background

Title 18, United States Code, Section 922(g)(3) makes it criminal for any person "who is an unlawful user of or addicted to any controlled substance" to possess a firearm. The statute was enacted as part of the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, which amended the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197. The subsection was amended in 1986, replacing references to "narcotic drug" with then-new federal terminology related to "controlled substances." Pub. L. No.

99-308, § 102, 100 Stat. 449 (1986). The Gun Control Act provided a summary of Congress's purpose in passing § 922(g): "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence." Pub. L. 90-618, § 101, 82 Stat. 1213.

This statement of purpose is consistent with § 922(g)(3)'s legislative history. In the years before its enactment, President Lyndon B. Johnson and both Houses of Congress recognized that drug use often motivates crime. *See* H.R. Doc. No. 407, 89th Cong., 2d Sess. 7 (1966) (presidential message) ("Drug addiction . . . drives its victims to commit untold crimes to secure the means to support their addiction."); H.R. Rep. No. 1486, 89th Cong., 2d Sess. 8 (1966) ("Narcotic addicts in their desperation to obtain drugs often turn to crime in order to obtain money to feed their addiction."); S. Rep. No. 1667, 89th Cong., 2d Sess. 13 (1966) (observing that drug users can be driven "to commit criminal acts in order to obtain money with which to purchase illegal drugs").

Consistent with this legislative history, the Supreme Court has interpreted the Omnibus Crime Control and Safe Streets Act, as amended by the Gun Control Act and subsequent amendments, as evincing a congressional purpose of keeping firearms out of the hands of criminals. *See Scarborough v. United States*, 431 U.S. 563, 572 (1977) (holding that the legislative history of these statutes supports the view that Congress sought to disarm those who may not be trusted to possess a firearm); *Barrett v. United States*, 423 U.S.

212, 220 (1976) (explaining that the "principal purpose" of federal gun control legislation is "to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency").

Finally, in enacting the Gun Control Act, Congress recognized its constitutional limits. The statute expressly declared that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of . . . personal protection, or any other lawful activity." Pub. L. 90-618, § 101, 82 Stat. 1213.

## C.  Analysis

### 1.  Under Supreme Court and Seventh Circuit Precedent, Section 922(g)(3) Remains Constitutional.

Section 922(g)(3) is constitutional under binding precedent that *Bruen* did not disturb. In *Yancey*, 621 F.3d at 687, this Court affirmed the constitutionality of § 922(g)(3) after considering the Supreme Court's decisions in *Heller*, 554 U.S. 570, and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). And it did so after explicitly examining § 922(g)(3)'s historical roots. *Id.* at 684-85. Where the Supreme Court's decision in *Bruen* requires nothing more, *Yancey* remains good law.

More specifically, in *Heller*, 554 U.S. at 635, the Supreme Court held that the Second Amendment protects the individual "right of law-abiding, responsible citizens" to possess handguns in the home for self-defense. Consistent with that conclusion, *Heller* cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and it described those restrictions as "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26. *Heller* incorporated that understanding into its holding, ruling that the plaintiff was entitled to possess a handgun only if he was "not disqualified from the exercise of Second Amendment rights"—meaning, among other things, that he was "not a felon and is not insane." *Id.* at 631, 635. That "exception[]," *Heller* explained, had "historical justifications," which the Supreme Court would have "time enough to expound upon" "if and when" the exception came "before" it. *Id.* at 635. *See also New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (*Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm," including laws "prohibiting possession by felons and other dangerous individuals") (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting).[4]

---

[4] The majority in *New York State Rifle & Pistol Association* concluded that petitioners' Second Amendment claim was rendered moot after New York amended the challenged firearms regulation. 140 S. Ct. at 1526.

Two years later, in *McDonald*, 561 U.S. 742, the Supreme Court extended *Heller* to state and local governments. In so doing, it "repeat[ed] [its] assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" *Id.* at 786 (quoting *Heller*, 554 U.S. at 626-27). *McDonald* added: "Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms." *Id.*

In *Yancey*, this Court analyzed the teachings of *Heller* and *McDonald* in upholding the constitutionality of the statute at issue here. 621 F.3d at 683 ("In considering the constitutionality of § 922(g)(3), we begin with the Supreme Court's recent decisions in *Heller* and *McDonald*."). *Yancey* started with the well-settled premise that "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people" with the goal of "suppressing armed violence." *Id.* In endorsing that sound objective, this Court highlighted that many states likewise have enacted laws restricting the right of habitual drug users or alcoholics from possessing or carrying firearms. *Id.* at 684 (collecting statutes). *Yancey* observed that these "state prohibitions . . . are merely the latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification." *Id.* In this Court's view, the "entrenched" nature of such

restrictions on the possession of firearms "supported their constitutionality." *Id.*

In reaching its conclusion that "Congress acted within constitutional bounds by prohibiting illegal drug users from firearm possession," *Yancey* analyzed § 922(g)(3)'s disarmament of habitual drug users to historical laws that disarmed non-law-abiding and irresponsible citizens, such as felons. *Id.* at 684-85. *Yancey* also compared habitual drug users to the mentally ill—who, "in eighteenth century America, justices of the peace were authorized to lock up"—and explicitly found a "similarity between the two groups," in that both "are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Id.* at 685.

Ten years later, in *Cook*, this Court reaffirmed the soundness of *Yancey*'s holding, squarely rejecting defendant's "Second Amendment objection to [§ 922(g)(3)]" and proclaiming: "the law is settled in this Circuit." 970 F.3d at 878.[5]

---

[5] Other federal courts of appeals likewise have held that "§ 922(g)(3) is the type of longstanding prohibition on the possession of firearms that *Heller* declared presumptively lawful." *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010); *see also United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) (agreeing with *Yancey* and *Seay* that "§ 922(g)(3) . . . embodies a long-standing prohibition of conduct similar to the examples mentioned in *Heller*" and thus "permissibly limits the individual right to possess weapons provided by the Second Amendment").

Two years after *Cook*, the Supreme Court revisited the Second Amendment in *Bruen* and re-directed courts to assess whether such regulations "are consistent with the Second Amendment's text and historical understanding." 597 U.S. at 26. *Bruen* did not overrule *Heller* or *McDonald*. *Id.* at 19, 22-24. Rather, it found that courts had misinterpreted those precedents when adding a means-end scrutiny to the Second Amendment analysis, supplementing *Heller*'s history-focused methodology with a "judge-empowering 'interest-balancing inquiry'" that *Heller* and *McDonald* had "expressly rejected." *Id.* at 22 (quoting *Heller*, 554 U.S. at 634). This "two-step approach," *Bruen* explained, was "one step too many." *Id.* at 19.

*Bruen* thus re-oriented courts to "[s]tep one of the predominant framework," as set forth in *Heller*, "which demands a test rooted in the Second Amendment's text, as informed by history." *Id. Bruen* first directed that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. Second, *Bruen* continued, where a regulation infringes on presumptively protected conduct, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (cleaned up).

In *Yancey*, this Court explained that § 922(g)(3) "was substantially related to an important governmental objective"—namely, keeping guns away from risky individuals—but it expressly "declined to wade into [a] levels of scrutiny quagmire." 621 F.3d at 683 (cleaned up). And in affirming the constitutionality of § 922(g)(3), *Yancey* engaged in the precise historically rooted analysis that *Heller* initially called for and *Bruen* re-emphasized. *Yancey* and *Cook* thus remain good law, meaning that in this Circuit, § 922(g)(3) remains constitutional. Indeed, *Bruen* itself endorsed pre-existing circuit precedents that were "broadly consistent with *Heller*['s]" historical focus. 597 U.S. at 19.

Other language in *Bruen* underscores *Yancey*'s still-binding nature. In *Bruen*, the Supreme Court again emphasized that the right to keep and bear arms belongs to "law-abiding, responsible citizens." *Id.* at 26 (quoting *Heller*, 554 U.S. at 635). Although *Bruen* did not explicitly decide "who may lawfully possess a firearm or the requirements that must be met to buy a gun," *id.* at 72 (Alito, J., concurring), it characterized the holders of Second Amendment rights as "law-abiding" citizens no fewer than 14 times. For example, *Bruen* concluded that the New York statute at issue "prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms," *id.* at 71; and explained that the Second Amendment "'elevates above all other interests the right of law-abiding, responsible citizens to use arms' for

self-defense," *id.* at 26 (quoting *Heller*, 554 U.S. at 635).[6] In the same vein, Justice Kavanaugh, writing separately and joined by Chief Justice Roberts, stated that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" remain "presumptively lawful." *Id.* at 81 (cleaned up). In his concurrence, Justice Alito likewise explained that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns." 597 U.S. at 72 (internal citation omitted). *See also id.* at 129-30 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) (same).

In other words, six Justices in *Bruen* emphasized that the Second Amendment, on its face, extends only to law-abiding, responsible citizens (a group that, by definition, excludes habitual drug users) and that firearm prohibitions are presumptively constitutional where they disarm felons and the mentally ill (the very same groups to which *Yancey* analogized habitual drug users).

Just recently, in *United States v. Gay*, 98 F.4th 843 (7th Cir. 2024), this Court relied on the above-referenced language from *Bruen* to reject a defendant's as-applied challenge to the constitutionality of 18 U.S.C. § 922(g)(1), which forbids felons from possessing firearms. *Gay* found

---

[6] *See also Bruen*, 597 U.S. at 9, 15, 29-31, 33 n.8, 38 & n.9, 60, 70.

defendant's claim "hard to square" with *Heller*, which "pointedly stated that 'longstanding prohibitions on the possession of firearms by felons' are valid." *Id.* at 846 (quoting 554 U.S. at 626). *Gay* stressed that *McDonald* and *Bruen* did nothing to alter *Heller* and, indeed, that "[w]hen describing the persons who possess rights under the Second Amendment, *Bruen* repeatedly used the phrase 'law-abiding, responsible citizens' or a variant." *Id.* (citation omitted). *Gay* further noted that multiple Justices had written separately in *Bruen* to explain that the decision "did not change anything about *Heller*." *Id.* (first citing *Bruen*, 597 U.S. at 72 (Alito, J., concurring); and then citing *Bruen*, 597 U.S. at 80–81 (Kavanaugh J., concurring)). By recognizing the fundamentally unaltered nature of the Supreme Court's Second Amendment jurisprudence beginning with *Heller*, *Gay* thus serves as an affirmation of *Yancey*.

In short, *Yancey*, which properly applied *Heller* in upholding the constitutionality of § 922(g)(3) and accurately forecast *Bruen*'s renewed emphasis on historical inquiry, remains good law. The district court therefore did not err in adhering to this Circuit's precedent when denying defendant's motion to dismiss the indictment.

## 2. Section 922(g)(3) Is Part of This Nation's Historical Tradition of Firearms Regulation and Thus Constitutional Under the Second Amendment.

Even if this Court were to re-examine § 922(g)(3)'s constitutionality following *Bruen*, the statute remains lawful under the Second Amendment because it "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. At least three categories of laws demonstrate that tradition: laws disarming groups who presented a risk of danger; laws disarming intoxicated individuals; and laws disarming the mentally ill. Those laws are summarized immediately below; in Section I.C.3, the government explains how such laws are sufficiently similar to § 922(g)(3) for purposes of establishing that statute's constitutionality.

***Laws disarming groups who presented a risk of danger.*** English common law established the government's right to disarm those who posed a threat to the safety of others. For instance, the Statute of Northampton codified the common-law prohibition on "go[ing] armed to terrify the King's subjects." Sir John Knight's Case, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686); Statute of Northampton, 2 Edw. 3, c.3 (1328). The Militia Act of 1662 later authorized crown officers to seize the arms of those "judge[d] dangerous to the Peace of the Kingdom.'" 13 & 14 Car. 2, c.3, § 13 (1662). Similarly, early colonial laws disarmed those who carried firearms in a manner that spread fear or terror. *See* 1692-1694 Mass. Acts 11-12; 1696-1701 N.H. Laws 15.

Precursors to the Second Amendment proposed in state ratifying conventions further permitted legislatures to disarm individuals for "real danger of public injury." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (discussing the anti-Federalists' Pennsylvania proposal).[7] At the Massachusetts convention, Samuel Adams proposed an amendment providing that the Constitution shall "never [be] construed . . . to prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms." *Schwartz*, *supra* at 675, 681. And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Id.* at 758, 761.

Accordingly, as one early scholar wrote, the government could restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, A View of the Constitution of the United States of America 123 (2d ed. 1829). That understanding persisted after the Civil War. In 1866, for example, a federal

---

[7] *Heller* described Pennsylvania's minority proposal as "highly influential," 554 U.S. at 604, likely because, as another court has explained, "it represents the view of the Anti-federalists—the folk advocating for very limited federal power, opposing the Constitution generally, but advocating for a strong Bill of Rights," *see United States v. Coombes*, 629 F. Supp. 3d 1149, 1158 (N.D. Okla. 2022) (citing *United States v. Tooley*, 717 F. Supp. 2d 580, 590 (S.D. W. Va. 2010)). *Coombes*, quoting *Tooley*, continued: "Even these advocates of broad individual and state rights viewed the right to possess and carry arms as limited—particularly from those who had committed crimes or were a danger to the public." *Id.*

Reconstruction order applicable to South Carolina provided that, although the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866).

Historically, the government's right to disarm those who posed a threat to the safety of others included the right to disarm those who, in a legislature's view, could not be relied upon to obey the law. In 1689, for example, the English government passed a law disarming Catholics who refused to make declarations renouncing their faith. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688). This "Act for the better secureing the Government by disarming Papists and reputed Papists" provided that a Catholic individual could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." *Id.*; *see also United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023). Enacted shortly after the Glorious Revolution of 1688—when Protestant King William and Queen Mary succeeded Catholic King James II—this statute reflected the new government's perception that Catholics who refused to renounce their faith (and allegiance to the Pope) could not be trusted to obey English law and the risk that non-adherence presented to the social order. *Range v. Attorney Gen. of the U.S.*, 69 F.4th 96, 121-22 (3d Cir. 2023)

27

(Krause, J., dissenting); *Jackson*, 69 F.4th at 502; *Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting) (relying on sources concluding that "[the English] Parliament disarmed Catholics because the Protestant majority found them 'untrustworthy'" and therefore posed a threat).

Other historical examples in this vein abound. "Following the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants," who "often refused to take mandatory oaths acknowledging the King's sovereign authority." *See Range*, 69 F.4th at 120-21 (Krause, J., dissenting) (collecting sources). The 1689 English Bill of Rights— the Second Amendment's predecessor—specified that only "*Protestants* may have Arms for their Defence suitable to their Conditions *and as allowed by Law.*" 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (emphases added); *see also Jackson*, 69 F.4th at 502; *Atkinson v. Garland*, 70 F.4th 1018, 1031 (7th Cir. 2023) (Wood, J., dissenting). In the colonies, in 1624, the Virginia Company disarmed Richard Barnes, who disrespected authorities through "opprobrious" and "base and detracting speeches concerning the Governor," *see Range*, 69 F.4th at 122 (Krause, J., dissenting); Massachusetts disarmed supporters of an outspoken preacher in the 1630s because "authorities concluded their conduct evinced a willingness to disobey the law,"

*id.* at 123;[8] Virginia disarmed "nonconformist Protestants . . . due to their rejection of the King's sovereign power over religion" in the 1640s, *id.*; and in 1696 and during the Seven Years' War of 1756-1763, colonies disarmed Catholics and Moravians, "a group of nonconformist Protestants from modern-day Germany," *id.* at 123-24.[9] *See also id.* at 122-24 & nn.50-70 (collecting sources).

Undoubtedly, today the disarmament of religious minorities would be understood as a violation of the Equal Protection Clause—as would the categorical disarmament of Blacks and Native Americans, another abhorrent practice pervasive in our country's historical tradition.[10] But, considered solely for the limited purpose of the historical inquiry required by *Bruen*, these laws nonetheless "reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted." *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting); *see also Jackson*, 69 F.4th at

---

[8] *See also* Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644, 648 (1937)); Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978); James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988).

[9] *See also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 263 (2020).

[10] *See, e.g.*, *Atkinson*, 70 F.4th at 1035 & n.2 (Wood, J., dissenting) (citing "laws that disarmed persons found guilty of treason and members of native tribes"); Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006) ("Laws disarming groups such as slaves, freed blacks, Indians, and those of mixed-race ancestry were common.").

503; *Range*, 69 F.4th at 122 n.50; *United States v. Agee*, No. 21-CR-350, 2023 WL 6443924, at *8 (N.D. Ill. Oct. 3, 2023) (noting that "the right to equal protection . . . was not interpreted as applying to federal laws until the mid-20th century, well after the ratification of the Second Amendment"). "[O]ne can accept that the Framers denied firearms to groups they thought to be particularly dangerous (or unvirtuous, or irresponsible) without sharing their conclusion about which groups qualify as such." *See* Joseph Blocher & Catie Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders* at 12, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Blocher, J. et al. eds.) (forthcoming).[11]

Class characteristics aside, throughout the Revolutionary War, legislatures continued to pass disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government—and as a result, threatened the social order. A 1775 Connecticut law provided that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not

---

[11] Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696 (last visited May 28, 2024) as well as in the government's appendix.

allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1890) (1775 Conn. Law). In 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. *4 Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six colonies enacted legislation in this vein. *See Jackson*, 69 F.4th at 503 (pointing to Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey); *see also Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) ("During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").[12]

North Carolina's and Pennsylvania's laws are particularly informative because the year before they were enacted, these states adopted constitutional provisions protecting the individual right to bear arms. *Heller*, 554 U.S. at 601; *see* N.C. Declaration of Rights of 1776 § XVII, *in* THE COMPLETE BILL OF

---

[12] *See also* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, at 479-84 (1886) ("1776 Mass. Law"); 7 Records of the Colony of Rhode Island and Providence Plantations in New England, at 567 (1862) ("1776 R.I. Law"); 1 The Public Acts of the General Assembly of North Carolina, at 231 (1804) (1777 N.C. law); Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776, at 90 (1777); 9 The Statutes at Large of Pennsylvania from 1682 to 1801, at 112-13 (1903) ("1777 Pa. Law"); 9 The Statutes at Large; Being A Collection of All the Laws of Virginia, at 282 (1821) ("1777 Va. Law").

RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND ORIGINS 277-78 (Neil Cogan ed., 2d ed., 2014); Pa. Declaration of Rights of 1776 § XIII, *in* THE COMPLETE BILL OF RIGHTS, *supra*, at 278.

*Intoxication laws.* The Founders likewise recognized that those who regularly became intoxicated threatened the social and political order. *See, e.g.*, Benjamin Rush, An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind 6 (1812) (describing drunkenness as a "temporary fit of madness"). A 1658 Massachusetts law, for example, allowed constables to apprehend those "overtaken with drink" and keep them "in close custody" until brought before a magistrate. *See* The Charters & General Laws of the Colony and Province of Massachusetts Bay 82 (1814).

Founding-era legislatures also adopted specific measures to separate firearms and alcohol, including regulating firearm use by individuals deemed likely to become intoxicated. A 1655 Virginia law prohibited "shoot[ing] any gunns at drinkeing [events]," regardless of whether attendees became intoxicated. 1 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia 401-02 (1823). A 1771 New York law similarly barred firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor." *Heller*, 554 U.S. at 632 (quoting 5 Colonial Laws of New York 244-46 (1894)). And a 1731 Rhode Island law

forbade firing guns or pistols in any tavern at night. *See* Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations 120 (Hall, 1767).

Militia laws from the 1700s further reflect early legislatures' judgments about the dangers of allowing intoxicated individuals to carry firearms. New Jersey, Pennsylvania, and South Carolina disarmed or authorized the confinement of intoxicated militia members. *See* 2 Arthur Vollmer, U.S. Selective Serv. Sys., Military Obligation: The American Tradition, pt. 8, New Jersey, at 25-26 (1947) (1746 law disarming those who appeared "in [a]rms disguised in [l]iquor"); *id.* pt. 11, Pennsylvania, at 97 (1780 law disarming those "found drunk"); *id.* pt. 13, South Carolina, at 96 (1782 law allowing officers to be cashiered or "confined till sober"). Similar laws persisted into the 1800s, *see, e.g.*, James Dunlop, The General Laws of Pennsylvania 405-06 (2d ed. 1849) (1822 law)—by which time at least three states outright excluded "common drunkards" from the militia, *see* 1844 R.I. Pub. Laws 503; 1837 Me. Laws 424; 1837 Mass. Acts 273.

During the 19th century, as social norms surrounding, and attitudes about, alcohol changed, and as firearms became less cumbersome, *see, e.g.*, Randolph Roth, "Why Guns Are and Are Not the Problem," in Jennifer Tucker, et al., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (2019); Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 14-16 (1987), limits

(including criminal penalties) on the carry, use, and receipt of firearms or pistols by intoxicated individuals proliferated to cover the general public. Lender, Drinking in America, at 45-46. Multiple states passed laws prohibiting members of the general public from carrying firearms while drunk. *See, e.g.*, 1867 Kan. Sess. Laws 25 (prohibiting those "under the influence of intoxicating drink" from carrying a pistol or other deadly weapon); 1878 Miss. Laws 175-76 (prohibiting selling weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290 (prohibiting person in "state of intoxication" from going "armed with any pistol or revolver"); 1909 Idaho Sess. Laws 6 (prohibiting "hav[ing] or carry[ing]" any "deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks"). Such statutes were considered "in perfect harmony with the constitution" and "a reasonable regulation of the use of such arms" even where state constitutions were understood to secure an individual's right to bear arms. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

**Laws disarming the mentally ill.** Similarly, "historical evidence supports the view that society did not entrust the mentally ill with the responsibility of bearing arms." *Mai v. United States*, 952 F.3d 1106, 1114 (9th Cir. 2020). For example, in England, the Vagrancy Act of 1744 allowed justices of the peace to lock up and seize the property of those "who by lunacy … are

furiously mad, or are so far disordered in their senses that they may be dangerous." 17 Geo. 2, c. 5 (capitalization altered); Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1800),* 19 Law & Soc'y Rev. 487, 509-510 (1985). A "lunatic" could include a person who "hath lucid intervals; sometimes enjoying his senses, and sometimes not." 1 William Blackstone, *Commentaries on the Laws of England* 294 (1765); *see also* Edward Coke, *The First Part of the Institutes of the Lawes of England, or, a Commentarie upon Littleton* § 405, at 247 (1628).

In pre-Founding and Founding-era America, those who had become affected with mental illnesses "were generally treated as if they had been . . . [s]tripped of all . . . their rights and privileges." Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* 41 (1949). In the same vein, some American colonies authorized justices of the peace to "lock[ ] up 'lunatics' considered "dangerous to be permitted to go abroad." Henry Care*, English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774). And around the time of the Second Amendment's ratification, several states enacted laws—tracking the English Vagrancy Act— that permitted the commitment of persons determined by justices of the peace, magistrates, or selectmen to be "[l]unatics" or of "unsound mind." *See, e.g.*, 1769 Va. Act 13; 2 William Littell, *The Statute Law of Kentucky* 578 (1810) (referencing statute of 1787); 1 Samuel Shepherd, *Statutes at Large of Virginia*

*from October Session 1792, to December Session 1806, Inclusive* 163 (1835) (1792 law); 1798 Mass. Act 813; 1 *The Public Statute Laws of the State of Connecticut* 386 (1808) (1793 law). Governing officials under these and other provisions had "a lot of discretion when deciding whether to confine the mentally ill," and "[i]t should come as no surprise that confinement did not include access to guns." *See United States v. Veasley*, 98 F.4th 906, 913 (8th Cir. 2024).

By the 19th century, a "dramatic growth in population" caused mentally ill persons to be "more visible, and public concern about security increased." Gerald N. Grob*, The Mad Among Us: A History of the Care of America's Mentally Ill* 24 (1994). As relevant societal conditions changed, so did the nature and specificity of firearms regulations related to the mentally ill. As the 19th century progressed, several states banned the sale of guns to the mentally ill. *See* 1881 Fla. Laws 87; 1883 Kan. Sess. Laws 159; 1899 N.C. Pub. Laws 202-1; *see also* Sam Kimble, *Revised Ordinances of the City of Manhattan and Rules of the Council* 49 (1887). In the 20th century, more regulations restricting the delivery or sale of firearms were extended to the mentally ill. *See, e.g.*, 1927 N.J. Laws 745; 1931 Pa. Laws 499; 1935 Ind. Act 161; 1935 S.D. Sess. Laws 356; 1935 Wash. Sess. Laws 601; 1936 Ala. Acts 52; 47 Stat. 650, 652 (1932).

Given this entire body of American law, "longstanding prohibitions on the possession of firearms" by the mentally ill have a well-established "historical tradition." *Heller*, 554 U.S. at 626; *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring); *Yancey*, 621 F.3d at 685 ("*Heller* and *McDonald* endorsed the exclusion of the mentally ill from firearm possession as presumptively valid.").

**3.      Section 922(g)(3) Is Sufficiently Similar to Historical Traditions of Disarming Those Who Presented a Risk of Danger, the Intoxicated, and the Mentally Ill.**

As *Yancey* and *Cook* recognized, the historical traditions identified above demonstrate that Congress may keep firearms out of the hands of habitual drug users without offending the Second Amendment. Regular users of controlled substances are, by definition, habitual law breakers who cannot be trusted to act responsibly. *See Cook*, 970 F.3d at 874. Moreover, as *Cook* observed, there is a "well-established link between chronic drug use and violence." *Id.*; *see also Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment) ("A drug user may commit crime in order to obtain money to buy drugs; and . . . violent crime may occur as a part of the drug business"). And "like the mentally ill, [regular drug users] are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Yancey*, 621 F.3d at 685. *See also Harmelin* 501 U.S. at 1002 (Kennedy, J., concurring in part and

concurring in the judgment) ("A drug user may commit crime because of drug-induced changes in physiological functions, cognitive ability, and mood"). As then-Judge Barrett noted in her dissenting opinion in *Kanter*, 919 F.3d at 451, "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."

Moreover, as this Court has observed, the burden imposed by § 922(g)(3) on the rights of habitual drug users—like defendant—is comparatively "less onerous" than the "lifetime ban" faced by felons or the mentally ill, as "an unlawful drug user like [defendant] could regain his right to possess a firearm simply by ending his drug abuse." *Yancey*, 621 F.3d at 686-87; *Dugan*, 657 F.3d at 999 (same). The limited scope of the restriction further supports § 922(g)(3)'s constitutionality. *See Bruen*, 597 U.S. at 29 (directing courts to examine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified").

Defendant argues that the dearth of historical laws disarming users of illegal narcotics suggests that doing so is inconsistent with our nation's tradition of firearms regulation. Br. 18-25. But *Bruen* made clear that analogical reasoning under the Second Amendment "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." 597 U.S. at 30 (emphasis in original); *see also id.*

(stressing that "analogical reasoning" is not a "regulatory straightjacket"). "So, even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* The government must show that the challenged regulation "is consistent with our nation's tradition," but it "need not go further and dig up an 18th century law under which [defendant], specifically, would have been disarmed." *United States v. Perez-Garcia*, 96 F.4th 1166, 1185-86 (9th Cir. 2024); *see also Gay*, 98 F.4th at 847 (indicating that parolees lack Second Amendment right to carry firearms). Our nation's history is replete with laws designed to keep firearms away from people deemed dangerous, untrustworthy, intoxicated, or mentally unsound—objectives all served by a law disarming those who regularly use, or are addicted to, controlled substances.

Defendant suggests that because dangerous narcotics like the ones he abused (heroin and crack cocaine) were not outlawed in the United States until the 20th century, keeping firearms away from their addicts does not comport with the Founders' vision of the Second Amendment. *See* Br. 23-24. To the contrary, the relatively recent proliferation of such addictive and dangerous narcotics reveals that the problem § 922(g)(3) seeks to address is what *Bruen* labeled an "unprecedented societal concern," warranting a "more nuanced approach." 597 U.S. at 27. While defendant points out that precursor substances, like opium, were discovered long before our nation's founding, Br.

22-23, he can point to no historical source demonstrating that they were commonly abused in colonial times. Indeed, drugs were not widely used as intoxicants in the United States until the late 19th and early 20th centuries. *See, e.g.*, David F. Musto, *The American Experience with Stimulants and Opiates*, PERSP. ON CRIME & JUST. 51, 63 (1997-98). Nevada was the first state to regulate opium, by requiring a prescription to obtain it beginning in 1877. Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America*, 1776–1914, at 25 (2023). And general prohibitions on controlled substances did not emerge until approximately the 1880s. *See* U.S. Treasury Dep't, STATE LAWS RELATING TO THE CONTROL OF NARCOTIC DRUGS AND THE TREATMENT OF DRUG ADDICTION (19631) 1-9 (describing development of state-level laws). Through that lens, § 922(g)(3) is a modern law to fix a modern problem, and therefore is properly analogized to the numerous early laws that kept firearms from those deemed untrustworthy, dangerous, and mentally unwell.

The unprecedented danger posed by modern firearms is another indication that § 922(g)(3) addresses a crisis not faced by the Founders. Congress enacted § 922(g) to quell an epidemic of gun violence, including a "precipitous rise in political assassinations, riots, and other violent crimes involving firearms." *See Lewis v. United States*, 445 U.S. 55, 63 (1980). While the Founders in 1791 were motivated to keep the firearms of their time away

from those who could not be trusted to use them lawfully and safely, by the 1960s, Congress was facing "the widespread traffic in firearms," "their general availability," and the "ease with which firearms could be obtained"—all of which contributed "significantly to the prevalence of lawlessness and violent crime in the United States." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). In other words, when § 922(g)(3) was enacted, the prevalence and potency of both firearms *and* controlled substances presented a confluence of dangers with which the Founders simply did not have to contend. *See United States v. Gates*, No. 22-CR-397, 2023 WL 5748362, at *8 (N.D. Ill. Sept. 6, 2023) (upholding constitutionality of § 922(g)(1) after observing that "[m]odern firearms can fire multiple rounds without reloading, whereas most guns available in 1791 'could not fire more than one shot without being reloaded'" and "[m]odern firearms manufacturers can produce firearms at greater volumes than those in 1791") (quoting *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 410 (7th Cir. 2015)). *See also United States v. Thompson*, No. 21-CR-00284, Dkt. 58 at 3 (N.D. Ill. Feb. 21, 2024) ("The twentieth-century

problem of gun violence is different in scale and kind from the perceived risk to the social order from firearms at the founding.").[13]

Defendant's citation to *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), does not aid his constitutional claim. Stressing the "narrowness of [its] holding," the Fifth Circuit in *Daniels* sustained an as-applied challenge to § 922(g)(3) where, the evidence showed, defendant smoked marijuana "multiple days per month," but where the government failed to prove that his "drug use was so regular and so heavy" as to render him dangerous or impaired in a way comparable to one who is mentally ill. *Id.* at 339, 350. By contrast, the evidence in the instant case showed defendant used far more dangerous drugs (heroin and crack cocaine) with exponentially greater frequency (daily for 20

---

[13] Defendant is wrong that *Bruen* imposes "two standards" of historical inquiry—one requiring a "distinctly similar" historical law to justify a regulation addressing a problem that has long plagued the country, and a less burdensome one needing a "relevantly similar" law to justify a problem with a modern genesis. Br. 18. In analyzing New York's proper-cause requirement for public carry licenses—the firearm prohibition at issue in *Bruen*—the Supreme Court concluded that New York's requirement addressed a societal problem that existed in the 18th century ("handgun violence, primarily in urban areas"). 597 U.S. at 27 (cleaned up). It further found that New York was unable to identify a historical precursor "distinctly similar" to the modern regulation: a broad prohibition on the public carry of commonly used firearms for personal defense, or a limitation of the right to public carry to law-abiding citizens who had demonstrated a special need for self-defense. *Id.* at 38. Yet *Bruen* did not find this conclusion fatal to the state's case. "[T]he lack of a distinctly similar historical regulation"—while "relevant evidence that the challenged regulation is inconsistent with the Second Amendment"—was not dispositive. *Id.* at 26-27 (emphasis added). Instead, *Bruen* compared the various justifications for, and burdens imposed by, the historical analogues offered by New York to the challenged firearm regulation. *See generally id.* at 38-70.

years) and in a manner that led him to trade a firearm to a known felon (to feed his addiction), who promptly endangered the community by firing that weapon in a residential neighborhood. *See* Ex. 20 at 4-24.[14]

Moreover, since *Daniels*, the Eighth Circuit, in *Veasley*, 98 F.4th at 906, rejected a facial challenge to § 922(g)(3) on the grounds that disarming at least *some* habitual drug users is analogous to our nation's historical tradition of keeping firearms away from dangerous or mentally ill members of society whose possession would "terrify others." *Id.* at 917-18 (albeit while hypothesizing that such tradition may not prohibit "the 80-year-old grandmother who uses marijuana for a chronic medical condition"). And, as mentioned above, this Court in *Gay* rejected an as-applied challenge to § 922(g)(1), reasoning that, even assuming as-applied Second Amendment challenges are proper, Gay's challenge failed because his prior felony convictions and status as a parole violator put him outside the population of "'law-abiding, responsible' person[s] who ha[ve] a constitutional right to possess firearms." 98 F.4th at 847. To the extent defendant is lodging an as-applied challenge, it should be rejected.

---

[14] On October 5, 2023, the government filed in the Supreme Court a petition for certiorari in *Daniels*. That petition remains pending. *See United States v. Daniels*, No. 23-376 (S. Ct.).

And any facial challenge must fail because, as *Veasley* notes, to survive

such scrutiny "all the government has to do is identify constitutional

applications—even if they are unrelated to [defendant's] conduct." 98 F.4th at

910. While it is easy to conjure even more distressing instances involving

armed drug addicts, defendant's circumstance presents a compelling enough

case study to show how a habitual drug user with a firearm can present

dangers akin to a firearm in the hands of the mentally ill or others whom

society cannot trust to obey the law.

## II.   Section 922(g)(3) Is Not Unconstitutionally Vague.

### A.   Standard of Review

This Court reviews a challenge to a criminal statute's constitutionality

*de novo. Protho*, 41 F.4th at 827.

### B.   Analysis

Defendant argues that, even if § 922(g)(3) passes Second Amendment

muster, the term "unlawful user" itself is unconstitutionally vague. Br. 25-26.

His argument is foreclosed by this Court's precedent.

In *Yancey*, this Court found "unlawful user" to mean one "who regularly

ingests controlled substances in a manner except as prescribed by a physician,"

621 F.3d at 682, and made clear that, to be guilty of § 922(g)(3), "the habitual

abuse [must] be contemporaneous with the gun possession," *id.* at 687. In *Cook*,

this Court similarly observed that "there is no doubt as to the essence of what

the statute forbids: the possession of a firearm by one who is engaged in the regular and ongoing use of a controlled substance other than as prescribed by a doctor." 970 F.3d at 877. Consequently, *Cook* expressly rejected the claim defendant makes here: that § 922(g)(3) fails to provide sufficient notice as to who it prohibits from possessing a firearm. *Compare* Br. 26 (complaining that § 922(g)(3) fails to "establish minimal guidelines to govern law enforcement"), *with* 970 F.3d at 873 (rejecting defendant's claims that § 922(g)(3) has "no guidepost by which he can divine what sort of conduct is prohibited" and leaves "uncertainty as to exactly what is proscribed").

*Cook* likewise considered and rejected the other arguments defendant makes here—namely, that his Due Process rights are violated by the absence of a temporal nexus between using a controlled substance and possessing a firearm, and that the judiciary's attempt to fill any void left by the statutory language violates separation-of-powers principles. *See, e.g.*, Br. 32-37. As *Cook* explained, *Yancey* "acted in accord with other circuits which have concluded that the statute's reach is limited by two key requirements: (1) regularity of drug use (2) that is sufficiently contemporaneous with the possession of a firearm." 970 F.3d at 878-79. "That these are limits imposed on the offense by the judiciary rather than the face of the statute does not render them invalid." *Id.* at 879 (citing *United States v. Lanier*, 520 U.S. 259, 266 (1997) ("clarity at

the requisite level may be supplied by judicial gloss on an otherwise uncertain statute")).

Defendant separately contends that the jury instruction in the instant case illustrates how § 922(g)(3) is "hopelessly indeterminate," and accordingly, void as applied to him. Br. 38. Here, again, *Cook* controls. *Cook* rejected a defendant's bid to facially invalidate § 922(g)(3) on vagueness grounds (even after *Johnson v. United States*, 576 U.S. 591 (2015), which defendant invokes), explaining that such challenges are appropriate only when a "statute 'simply has no core' and lacks 'any ascertainable standard for inclusion and exclusion.'" 970 F.3d at 873 (quoting *Smith v. Goguen*, 415 U.S. 566, 578 (1974)). In explaining why § 922(g)(3) presents no such problem, this Court spotlighted that "Cook's conduct—possession of a firearm in the midst of a nearly ten-year period of marijuana use—epitomizes that core, which may explain why Cook is so keen to challenge the statute on its face rather than as applied." *Id.* at 874. That is all the more true with respect to defendant, who used more dangerous drugs than did Cook (heroin and crack cocaine) for twice as long (20 years). *See supra* at 10.

Consistent with *Yancey*, the jury was properly instructed that an "unlawful user of a controlled substance" is one who makes "regular and repeated use of a controlled substance"—not someone whose use is "one time or infrequent"—such that the government must "establish that [defendant]

was engaged in a pattern of regular and repeated use . . . during a period that reasonably covers the time a firearm was possessed." R. 106 at 24. As *Cook* made explicit, "the requirement that the drug use and firearm possession be contemporaneous does not literally mean that the defendant must have been ingesting (or under the influence of) a controlled substance at the same time as he possessed the gun," rather a jury instruction in this context is appropriate if it conveys that "regular or habitual drug use that is contemporaneous with the possession of a firearm" violates § 922(g)(3). 970 F.3d at 879 (cleaned up). That is precisely what the instruction did here. And, as set forth immediately below, that is exactly what the trial evidence showed.

Because defendant's conduct goes to the "core" of what § 922(g)(3) prohibits, his facial and as-applied vagueness challenges must fail.

### III. The Government Presented Sufficient Evidence for a Rational Jury to Find Defendant Guilty of Being an Unlawful User of, or Addicted to, a Controlled Substance In Possession of a Firearm.

#### A. Standard of Review

This Court reviews a district court's denial of a Rule 29 motion *de novo*, viewing the evidence in a light most favorable to the government. *See United States v. Jackson*, 5 F.4th 676, 682 (7th Cir. 2021). Its *de novo* analysis "is limited, however, to 'the legal question whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at

682 (quoting *Musacchio v. United States*, 577 U.S. 237, 243 (2016)). "Accordingly, [this Court] overturn[s] a district court's Rule 29 denial only if no rational trier of fact could have found the defendant guilty, a burden for defendants that [this Court has] described as nearly insurmountable." *Id.* (cleaned up).

## B.    Analysis

To convict defendant of violating § 922(g)(3), the government was required to prove he: (1) knowingly possessed a firearm; (2) was an unlawful user of or addicted to a controlled substance at the time of his possession; (3) knew he was an unlawful user of or addicted to a controlled substance; and (4) the firearm moved in interstate commerce before he possessed it. R. 106 at 20.

Defendant does not challenge that he used controlled substances or that he possessed the firearms charged in Counts One and Two. Instead, he argues that the evidence failed to show that—*at the times* he possessed those weapons—he was an unlawful user of controlled substances and that he knew it. Br. 44-47. Defendant overlooks the explicit admissions he made on the date of his arrest, which, by themselves, would support a rational jury's finding that defendant "regularly ingest[ed] controlled substances" in the relevant time periods. *Yancey*, 621 F.3d at 682. He likewise ignores the strength of the evidence corroborating those statements.

The indictment charged defendant with possessing the Beretta from on or about June 27 through June 29, 2020, and with possessing the Ruger from on or about June 27 through July 30, 2020. R. 92. The jury heard ample evidence that defendant used controlled substances in those timeframes. As outlined above, on July 30, 2020—a date specifically charged in Count Two— he admitted that he had used crack cocaine earlier *that day*. Ex. 20 at 4-5. More than that, he explicitly told the agents that he was a "drug addict," who had used heroin and crack cocaine *every day* for the previous 20 years. *Id.* at 4-5, 14. He estimated having purchased narcotics from German approximately 300 times in the prior eight months (more than once per day, on average). *Id.* at 7-9. And while he spoke with the agents about his drug habit, he had $60 on his person that—were it not for the agents arriving before his drug dealer did—he would have spent on more crack cocaine that very day. Tr. 58-61.

Other evidence corroborated defendant's admissions. From February 2020 through June 30, 2020, agents saw defendant come and go from German's house (the Robbins Residence) "very frequently," "sometimes multiple times per day." Tr. 79. When the agents later searched German's house to recover the Beretta, they found it inside a mattress next to bags of what they recognized to be narcotics. Tr. 20-21, 28-30. Additionally, the jury saw a video from March 19, 2020, in which defendant—according to the government's narcotics expert—appeared to be pouring narcotics into a glass pipe, an item

the jury was told is commonly used to ingest crack cocaine, and which agents later found in defendant's home on July 30, 2020. Tr. 15-20, 230-36, 288. And on June 14, 2020, defendant messaged German, seeking a half gram each of crack cocaine and heroin—further corroborating that German was his drug dealer. Ex. 20 at 16-22. Defendant gave German the Beretta on June 29, 2020, in the hopes of receiving narcotics as payment sometime later. Ex. 20 at 17-18. And, in the photograph of the Ruger defendant sent German on June 30, 2020, a similar glass pipe can be seen lying mere inches from the firearm as it rested on defendant's own leg. Ex. 12.

Even defendant's sister testified that her brother used narcotics during the relevant periods. Though she did claim that her brother had been sober for short stints over the years, Tr. 305, she also testified that her father's death on June 27, 2020—the beginning of the date ranges alleged in each count— triggered an increase in defendant's drug use in the following month. *See* Tr. 348 ("Q: Were you aware that he was using drugs more during that period of time? A: Yes, I was seeing it more"). Taking the evidence in the light most favorable to the government, a rational jury could easily conclude that defendant was engaged in the "regular and repeated use" of controlled substances in late June and July 2020. R. 106 at 24.

The same is true regarding whether defendant *knew* he was an unlawful user—an element requiring proof that he was aware he was using controlled

substances regularly, not that he knew such status rendered it unlawful to possess a firearm. *United States v. Maez*, 960 F.3d 949, 954-55 (7th Cir. 2020) (no willfulness requirement in § 922(g) offenses). Among numerous other related admissions, on July 30, 2020, defendant expressly told law enforcement that he was a "drug addict" with a habit of daily heroin and crack cocaine use. Ex. 20 at 4-5, 14. As the district court reasonably put it in rejecting the same argument post-trial: "if [defendant's statements to law enforcement were] not enough for a jury to conclude that he had the requisite state of mind, I don't know what is." Tr. 300.

The district court properly denied defendant's motion for judgment of acquittal.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that defendant's convictions and sentence be affirmed.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

RAMON VILLALPANDO
Assistant United States Attorney

/s/ *Brian J. Kerwin*
BRIAN J. KERWIN
Assistant United States Attorney
Deputy Chief of Appeals, Criminal Division

# RULE 32 CERTIFICATION

I hereby certify that:

1.  This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 11,937 words.

2.  This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:      /s/ *Brian J. Kerwin*
BRIAN J. KERWIN
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 886-1328

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2024, I electronically filed the foregoing

Brief of the United States with the Clerk of the Court for the United States

Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify

that all participants in the case are registered CM/ECF users and that service

will be accomplished by the CM/ECF system.

Respectfully submitted.

By:  /s/ *Brian J. Kerwin*
BRIAN J. KERWIN
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 886-1328